# IN RE: PETITION OF WESTINGHOUSE GATEWAY COMMUNITIES, INC. TO ESTABLISH A UNIFORM COMMUNITY DEVELOPMENT DISTRICT TO BE KNOWN AS THE GATEWAY SERVICES DISTRICT

## Case No. 85-2045

State of Florida, Division of Administrative Hearings

January 30, 1986

### APPEARANCES OF COUNSEL

**Ken Van Assenderp, Young, Van Assenderp, Varnadoe & Benton, P.A., Melvin D. Deutsch, II,** and **Timothy Jones,** for petitioners.

**Michael J. Ciccarone,** Assistant County Attorney, for Lee County, Florida.

### OPINION

P. MICHAEL RUFF, Hearing Officer.

### *REPORT AND CONCLUSIONS*

On October 21, 1985 a public hearing was held in this matter for the purpose of considering the petition of Westinghouse Gateway Communities, Inc. (Westinghouse) to establish the Gateway Services District pursuant to the terms and conditions of Chapter 190, *Florida Statutes* (1984). The hearing was held in Fort Myers at the Lee County Justice Center Complex, 1700 Monroe Street, Fort Myers, Florida. The

Petitioner was represented by counsel in the person of Ken Van Assenderp, Esq., Timothy Jones, Esq. and Melvin D. Deutsch, II, Esq. During the proceeding the Petitioner presented certain witnesses and offered certain exhibits, all of which were received into evidence in support of the petition. The pertinent local government entity namely Lee County, Florida, an affected person, participated in the proceeding and was represented by Michael J. Ciccarone, Esq., the Assistant County Attorney for Lee County. Lee County produced one witness who testified in the proceeding. Additionally, members of the general public were afforded an opportunity to present testimony and evidence. Aside from Petitioner's witnesses, all of whom supported establishment of the subject district, no other persons availed themselves of the opportunity to appear and offer testimony and evidence, and no testimony or evidence was presented in opposition to establishment of the subject district.

This proceedings began with the submission by Westinghouse of a petition seeking recognition by rule of the Gateway Services District, a Uniform Community Development District as envisioned by Chapter 190, *Florida Statutes.* The petition was submitted to the Lee County Commission on April 18, 1985, along with the required filing fee of $15,000 so that Lee County could avail itself in a timely manner of its opportunity to exercise its rights set forth in Section 190.05(1)(b), *Florida Statutes.* This proceeding officially commenced as envisioned by Rule 42-1.07, *Florida Administrative Code* on May 31, 1985, when Westinghouse filed a petition with the Secretary of the Florida Land and Water Adjudicatory Commission. A copy of the petition as submitted and filed is embodied in Petitioner's Composite Exhibit C (1-8) admitted into evidence. On June 27, 1985, prior to any required notice, Westinghouse filed its "Amended Petition for Rulemaking to Establish a Uniform Community Development District" which amended petition is in evidence as Petitioner's Composite Exhibit H.

The services contemplated by this particular petition, which will be afforded by the district to the Westinghouse Gateway Communities Real Estate Development, are:

1. Water management, bridges, and culverts.
2. Water.
3. Sewer service.
4. Roads and street lights.

These services shall hereinafter be term "infrastructure." The land to be serviced by this district lies solely within the boundaries of Lee

County, Florida, and totally within an incorporated area of that county being generally located southeast of the city of Fort Myers and north of the Lee County Regional Airport.

Pursuant to the requirements of Rule 42-1.09, *Florida Administrative Code*, John T. Herndon, the secretary of the Florida Land and Water Adjudicatory Commission certified that all the required elements of the petition as envisioned by that rule had been satisfied, and that all the required elements set forth in Section 190.005, *Florida Statutes*, and Rule 42-1.08, *Florida Administrative Code*, had been addressed. Secretary Herndon thereupon submitted the matter to the Division of Administrative Hearings for purposes of conducting the subject public hearing and providing a written report and conclusions thereupon. A copy of the letter of transmittal and the certification may be found as part of Petitioner's Exhibit F in evidence. Following the assignment of the proceeding to the undersigned Hearing Officer, on July 2, 1985, Glenn W. Robertson in his capacity as secretary to the Florida Land and Water Adjudicatory Commission (Commission) forwarded the above-mentioned amended petition by Westinghouse to the Division of Administrative Hearings, also certifying that it met the requirements of Rule 42-1.08, *Florida Administrative Code*. This transmittal and certification letter is embodied in Petitioner's Exhibit I in evidence and it indicated that "the amendment only changes the legal description to include additional rights of way . . . this is the only change and the petition is still certified to meet the requirements . . . and could be the document used for the local public hearing."

The undersigned Hearing Officer was assigned to this proceeding on June 28, 1985, and issued an Initial Order requiring coordination of all proper parties in anticipation of and preparation for the local public hearing. On July 17, 1985, after Petitioner responded to the Hearing Officer's Initial Order indicating suggested hearing dates in concert with the Assistant Attorney for Lee County, the Hearing Officer issued his Notice of Hearing pursuant to Section 190.05(1)(d), *Florida Statutes* and Rule 42-1.11, *Florida Administrative Code*, apprising the Petitioner as well as the Secretary and Counsel for the Commission of the date, location and related instructions for the local hearing.

The Commission, by notice published in the Florida Administrative Weekly, Volume 11, No. 31 at pages 2998-2999, dated August 2, 1985, gave "notice of receipt of petition," including a summary of the contents of the amended petition and a general description of the land area to be serviced by the petition, including the location of that land. This notice, furthermore listed the basic infrastructure the proposed district would construct, maintain and operate; delineated those ser-

vices which would require consent of Lee County before construction and maintenance; outlined an estimate of the cost of implementing the rule to establish this district and related economic impact, to the various agencies of state and local government, including also continuing annual economic impacts on such state and local governments from the operation of the district to be established by the rule; and gave notice of the time, date and location of the local public hearing. The notice also indicated that information to be elicited at the public hearing would be used by the Commission in making its decision to grant or deny the petition for rulemaking. The notice, finally, denoted where and the person from whom the full test of the petition could be obtained for perusal by those interested. A copy of this notice of receipt of petition may be found as Petitioner's Composite Exhibit J-L, in evidence. The Petitioner has also served Lee County with a copy of its amended petition.

The original Notice of Receipt of Petition contained a minor technical error at page 2998 on the second line in that it delineated the wrong name of the Petitioner. The correct name of the Petitioner appeared at page 2999 and the correct name of the proposed district appeared at page 2998 and all remaining information conveyed in the Notice of Receipt of Petition was correct. On August 16, 1985, in Volume 11, No. 33, at page 3203, the Commission filed its technical correction to the Notice of Receipt of Petition by inserting the correct name of the Petitioner. A copy of this correction is found in Petitioner's Composite Exhibit J-3 in evidence. In an abundance of caution, in order to prevent possible confusion on the part of the public and to preserve the integrity of the required time sequence related to notice of the rulemaking process, the Petitioner requested and was allowed to re-schedule the public hearing and to re-publish notice thereof. Accordingly, the hearing was re-scheduled at Petitioner's request for October 21, 1985, and a new Notice of Receipt of Petition was promulgated by the Commission and published in the Florida Administrative Weekly, at Volume 11, No. 37, at page 3570, dated September 13, 1985. A copy of this Notice of Receipt is in evidence as Petitioner's Composite Exhibit J-4.

Notice of the public hearing was provided in a newspaper of general circulation in the Lee County area, the Fort Myers News Press, pursuant to Rule 42-1.11(1)(a), *Florida Administrative Code*. The dates of notice publication for the hearing were September 20, 1985; September 27, 1985; October 4, 1985; and October 11, 1985. Proof of publication by the Fort Myers News-Press is in evidence as Petitioner's Composite Exhibit J-6.

189

Pursuant to Rule 42-1.11(1)(b), *Florida Administrative Code*, the Petitioner mailed written notice to each member of the prospective board of supervisors of the proposed district as well as to the Secretary of the Department of Community Affairs, and to the only affected unit of local general purpose government, that is, Lee County. The Lee County notice was addressed specifically to the County Manager, the County Planner, the County Engineer, and the County Attorney, with copies being provided to all members of the Lee County Commission. Copies of these notices may be found in Petitioner's Composite Exhibits J-11 through J-27.

The hearing conducted on October 21, 1985, was conducted as required by Section 190.005(1)(d), *Florida Statutes*, and pursuant to Rule 42-1.12, *Florida Administrative Code*. As set forth in Rule 42-1.12(4), *Florida Administrative Code*, the public hearing was transcribed and the transcript is forwarded along with this report and conclusions.

The witnesses who appeared and testified at the public hearing are as reflected in the index of witnesses set forth in the transcript of the proceedings. Their addresses and respective residences, and the location of those residences relative to the lands to be serviced by the proposed district, are described in the initial pages of the transcript attributed to the testimony by those witnesses. Their presentations are more completely described below. The items of evidence admitted in the record are set forth in the index of the exhibits found within the transcript of the proceedings. This index gives the page number at which a particular discussion is made on the topic of the individual exhibits. That index is self-explanatory, however, the following matters need to be pointed out with particularity.

In advance of reporting on the specific testimony and exhibits at the hearing and making the required conclusions, the undersigned Hearing Officer specifically has determined and herewith reports to the Commission, that ample, adequate, and legally sufficient Notice of the Receipt of Petition, including the Amended Petition, as well as the notice of the local preliminary information-gathering hearing was accomplished.

Moreover, for purposes of clarity and explanation, any one or all of the above-referenced services to be provided by the proposed district will be managed, planned, financed, maintained and otherwise provided for the direct benefit of the land which comprises the Westinghouse Gateway Community, which is a proposed development of regional impact, for which a development order was issued on May 31, 1985, by

Lee County, Florida with certain conditions. A copy of that development order, although not required to be attached to the Petition and not legally pertinent to establishment of the district, was introduced into evidence as Petitioner's Exhibit B for the purpose of generally describing the development which will be serviced by the district and for the purpose of referencing written provisions in the development order regarding the county's view of the proposed district.

The land within the boundaries of the proposed district comprises approximately 5,324 contiguous acres, located in central Lee County, bounded on the north by the proposed Colonial Boulevard Extension, toward the northeast and east by State Road 82, toward the south by Daniels Road and the Southwest Florida Regional Airport, and on the west by the "Six-Mile Cypress Slough." A map showing the location of the land area to be serviced by the district is attached as Exhibit 1 to the Amended Petition, part of Petitioner's Composite Exhibit H. A metes and bounds legal description of the external boundaries of the district is attached as Exhibit 2 to the Amended Petition, part of Petitioner's Composite Exhibit H. Only certain state road rights-of-way consisting of Interstate 75, as depicted in Exhibit 3 of the Amended Petition, and Petitioner's Composite Exhibit H, runs diagonally from a northwesterly direction to a southeasterly direction through the district, and is to be excluded from the district. None of the powers to be exercised by the district would directly impact the property because of the public nature of this right-of-way. The development to be serviced by the district will consist of a variety of single-family and multi-family housing units, as well as commercial, industrial and community services uses.

Under the terms of the Lee County development order, the development which will be serviced by the district is consistent with applicable local, regional and state planning policies and requirements. The development on the land to be serviced by the district has been designated as, and found suitable by Lee County in its development order, as suitable for development as a "new community," as explained in Section III, Land Use Plan Element, of the officially adopted Comprehensive Plan of Lee County, a land use which can be facilitated appropriately with the community development district mechanism.

Lee County's position, regarding the wisdom and efficacy of establishing the subject district, is largely depicted in certain findings made in that development order, which Lee County did not refute or recede from at the public hearing in this proceeding. Thus, Lee County has determined that the property for which the Gateway Development of Regional Impact was approved, is of sufficient size, sufficiently compact

191

and sufficiently contiguous to be developable as one functional, interrelated community (see factor 3, Section 190.005(1)(e), *Florida Statutes*).

Additionally, the county determined in that development order that the best alternative for delivering community development services and facilities to that Gateway Development is a "uniform community development district" as envisioned by Section 190.005(1)(e), *Florida Statutes*. Lee County has determined that the provision of community development services and facilities by way of a uniform community development district will not be incompatible with the capacity and uses of existing local and regional community development services and facilities. Thus the County has taken a position by virtue of the development order that a proposed uniform community development district as requested in the Amended Petition is compatible with items listed in factors 4 and 5 of Section 190.005(1)(e), *Florida Statutes*. Further indications of the acceptance or acquiescence by Lee County in the establishment and operation of the proposed uniform community development district are found in the following quoted references from that development order:

1. In condition No. 10 under the subject of "transportation," at page 13, the County has required that:

All internal roads shall be constructed (to Lee County standards), operated and maintained by Westinghouse Gateway Communities and/or the *community development district*. Except that operation and maintenance costs for arterial and collector roads that are built as a result of the Lee County official traffic ways map are exempted from WCG responsibility for operation and maintenance costs." (Emphasis supplied)

2. Under the subject of "water supply," condition No. 25 at page 17 of the development order indicates that:

All water lines within the community shall be installed, operated and maintained by Westinghouse Gateway Communities and/or the *community development district*. Lee County shall not, at any time, assume or be obligated to assume any financial responsibility for the operation and maintenance of the water and sewer lines within the community. (Emphasis supplied)

3. Pursuant to condition No. 33 under the subject of "sewage treatment" on page 18 of the Lee County Development Order it is provided:

All sewer lines within the community shall be installed, operated and maintained by Westinghouse Gateway Communities and/or the

192

*community development district.* Lee County shall not, at any time, assume or be obligated to assume any financial responsibility for the operation and maintenance of the water and sewer lines within the community. (Emphasis supplied)

4. Under the subject of "fiscal" on page 20 of the development order, it is required:

WGC shall file with the Florida Land and Water Adjudicatory Commission and diligently pursue a petition for approval of the uniform community development district, pursuant to Chapter 190, Florida Statutes (Supp. 1984), for the following services:

    a. water management,

    b. water supply,

    c. sewer and waste water management, and

    d. roads and street lights.

The Petitioner notified Lee County of its right under Section 190.005(1)(c), *Florida Statutes*, to conduct a public hearing to consider the relationship of the Amended Petition to the factors specified in Section 190.005(1)(e), *Florida Statutes*. Lee County did not conduct such a hearing and did not present either a resolution of support or object to the proposed district at the local public hearing conducted on October 21, 1985, by the undersigned Hearing Officer. The Lee County attorney did not appear at the hearing on behalf of Lee County, maintaining that the county's position was one of "constructive neutrality" and the county's purpose was to assist in providing clear, factual information to the Hearing Officer and to the public. Mr. Ciccarone confirmed that the county had agreed to the inclusion of certain county property consisting of road right-of-way for Daniels Road within the area to be included in the proposed district.

The Petitioner presented testimony by six witnesses, including duly qualified and accepted experts in the subjects of project management; planning; economics; engineering; district management; growth management, political science and political economics, concerning the subject of the satisfactory compliance of the Petitioner with those criteria set forth in Section 190.005(1)(e), *Florida Statutes*, (1984), quoted in the conclusions below. Lee County presented testimony of an expert witness in the general area of land use planning who is a senior planner on the county staff. The Petitioner called three additional witnesses in favor of establishment of the district, including the chairman of the Lee County Board of County Commissioners, the executive director of the Southwest Florida Regional Planning Council,

and the president of the Business Development Corporation. No evidence was presented in opposition to the establishment of the district and no witnesses appeared testifying in opposition to its establishment.

The Honorable Roland Eastwood, Chairman of the Lee County Commission favors the required infrastructure for the Gateway Development to be provided as envisioned by Chapter 190, *Florida Statutes.* So too, Mr. Wayne Daltry, the executive director of the Southwest Florida Regional Planning Council, recommends the establishment of a community development district to make sure that needed services for the citizens of the Gateway Development are provided and financed by that community itself. Mr. Lee Menzies, president of The Business Development Corporation of Southwest Florida, supports the establishment of the Gateway Services District because it places the burden of installing and paying for roads, water, sewer and drainage on the persons who directly benefit from those services rather than on the Lee County taxpayers at large. In short, these three witnesses totally supported the establishment of the Gateway Services District at issue.

Byron R. Koste, Executive Vice President of Westinghouse Gateway Communities, Inc., the Petitioner herein, was accepted without objection as an expert witness qualified to testify on large-scale long-term developments, their relationship to public policy and to private marketing requirements and specifically various management and financing vehicles for providing infrastructure for such developments. He has had, in the past, overall responsibility for planning, managing, and implementing the Westinghouse Development of Regional Impact and the proposed Gateway Services District, through and including the filing of the Amended Petition herein for establishment of that district. Also in the past, beginning in 1977, Mr. Koste has had experience with the establishment and operation of a similar community services district at nearby Pelican Bay in Collier County, Florida, immediately to the south of Lee County. He exercises supervision and control of a team of professionals responsible for both the Gateway Communities Development itself and the proposed establishment of the Gateway Services District, which would provide the infrastructure for that development. Mr. Koste's testimony was not refuted.

It was thus established that 100 per cent of the landowners of the real property to be included in the proposed district have furnished written consent to the establishment of the district encompassing their property. Most of the property is indeed owned by Westinghouse, the entity developing real estate in the proposed district. The initial board of supervisors for the district will be made up of five citizens of the

194

State of Florida from the Fort Myers-Naples area. There are, at present, no major trunk water mains, sewer interceptors or outfalls or other items of infrastructure which would support the development to be done in the district, with the exception of box culverts already existing for drainage under I-75. In this connection, Mr. Koste described the phased construction and development of various infrastructure services which are proposed to be provided by the district over a substantial period of time, together with a discussion and establishment of the cost in dollars of those services and infrastructure items which would be provided. A detailed summation of these items and their attendant projected costs appears on Exhibit 6 in evidence.

It was thus established that beginning January 1, 1986, through December 31, 1990, the sum of $5,385,285 would be expended on water management, bridges and culverts with an attendant $13,201,821 for water and sewer treatment, disposal and collection, and finally, $7,145,000 for roads and street lights. It should be noted that these estimated costs of construction are for those special powers permitted under Section 190.012(1), *Florida Statutes* only. No estimates were provided for any powers for such a district listed under 190.012(2) since the appropriateness of the use of those powers is determined by the local, general-purpose government within whose jurisdiction such powers are to be exercised (i.e. Lee County). Until that determination is made by the county, no cost estimates could be prepared by the district. It was established that the cost estimates for water management, bridges and culverts, water and sewer services, roads and street lights, included all basic infrastructure items authorized by Section 190.012(1)(A)(c), *Florida Statutes* and (1)(b) *Florida Statutes*. For the years after 1990, the various cost estimates for construction of items of infrastructure to be provided by the proposed district are depicted with the estimates occurring at five year intervals. The cost estimates are of similar orders of magnitude to those mentioned above and appear in detail on Exhibit 6. They were unrefuted and were demonstrated to be reasonable, thus they are accepted. The time tables related to those estimates of costs of construction for the years depicted on Exhibit 6 were shown to be reasonable in terms of the time such items of infrastructure will be required by the development, which will be developed in phases.

In this connection, the first phase of development of infrastructure services will be in the general southwestern corridor of the 5,300 acres encompassed by the district which lies closest to the Daniels Road extension and the regional airport. In that geographical area, the district will have to provide water, water management, sewer collec-

**195**

tion, treatment and disposal, and road improvements initially so that attendant real estate development can occur within the conditions imposed by the above-mentioned development order. The water management system itself will, however, have to be designed and installed on a district-wide basis because of the nature of the water management problem which must be addressed. Thus, the water management function will not be merely confined to "Phase 1" because, by the nature of the water management function, the water will have to be directed from the south and southeast towards the northwest for ultimate drainage to the Six Mile Cypress Slough which lies on the western margin of the district property.

In all other respects the infrastructure will be that to be constructed in the first phase in the southwestern corridor of the district territory closest to Daniels Road and the airport. As community development progresses, the infrastructure will be extended north and west as time and the real estate development market forces permit. Ultimately, all 5,300 acres of infrastructure will be provided by the year 2025. The Petitioners have received a conceptual water management permit from the Southwest Florida Water Management District prior to the public hearing herein. The conceptual permit having been granted, there merely remains for approval by the water management district, the design of the water management and control structures to be emplaced by the Petitioner.

Additionally, Mr. Koste established that, as determined in the development of regional impact review process which culminated in the Lee County Development Order, that the Gateway DRI property which is, in essence, coextensive with the prposed district property is of a sufficient size, compactness and is sufficiently contiguous to be developable and to have infrastructure services furnished and provided as one, functioning, interrelated community. He also showed that the best alternative available to deliver community development services and facilities such as water, sewer, roads and street lights, water management and drainage for the Gateway Community DRI to be the establishment of a uniform communty development district. Additionally, Mr. Koste established that the district, in exercising its functions related to providing basic services to the land area and development within the district, would comport in all ways to the conditions, referenced above, of the Lee County Development Order concerning the Gateway Communities DRI.

Under the terms and limitations of that development order, the Gateway Services District proposed would decide whether to exercise any one or more of the authorized powers allowed it under the

196

development order, within the ambit of Chapter 190, *Florida Statutes,* and would take into consideration, in deciding whether to exercise one or more of its authorized powers, who would capital costs for installation of facilities, who would own the facilities, who would operate, manage and maintain the facilities and services, and how construction, operation and maintenance would be financed, using available financial feasibility studies and other technical information compiled by various professionals at the time such studies become necessary. Under the scheme authorized by the development order, if the district decides not to provide one or more authorized and limited community services, then Westinghouse, the developer of the land, must provide those services. In any event, once the district is approved, if that occurs, then the decisions concerning who will operate, manage, maintain, construct and finance the various community services necessary for the development of the land encompassed by the proposed district can be made. Decisions, for instance, concerning financing the public service projects by the developer corporation through private debt or equity financing or alternatively, having the residents of the district pay for those facilities and services by assessments made by the district on district residents or by issuance of bonds.

Mr. Koste additionally established that the proposed district will comport with the Lee County Comprehensive Plan. The "new community" section of the comprehensive plan recognizes that from time to time there will be large communities that are approvable in terms of development, if services can be delivered efficiently and cost-effectively. The plan states that if such a community is aproved, then the service delivery system for infrastructures such as involved in the present district petition becomes critical and the plan suggests that a community development district is the appropriate solution to the service delivery system for such new communities as that involved in the district which is the subject of this petition.

Although no state comprehensive plan was in effect at the time the petition and the amended petition were filed herein, the petition of the district was submitted and filed after the staff of professionals who prepared and filed the petition closely monitored the progress of the state comprehensive plan through the 1985 legislative process and the proposed district generally comports with the state planning principles contained in the State Comprehensive Plan which took effect after the filing of the petition and amended petitions herein. The proposed Gateway Services District is consistent with the now-existent state plan.

Finally, Mr. Koste and his staff assessed the matter of the I-75 right-

of-way cutting through the western portion of the proposed district property such that the western portion of the property is isolated by I-75. Mr. Koste established that the land west of I-75 was very important to the district and essential to the overall water management function, since the surface water management program commencing with the issuance of the conceptual permit will provide that surface waters be directed onto that land and ultimately to the Six Mile Cypress slough which borders the western portion of the District property. Thus, the land west of I-75 is essential to the overall water management function to be provided to the development and therefore inclusion of it in the district is essential to render the entire land area suitable as a functionally, interrelated community. Mr. Koste further established that from the viewpoint of sufficiency of size, compactness and contiguity, the land area to be serviced by the district was suitable to be developed by the district as a functional community.

Several of the Petitioner's witnesses corroborated Mr. Koste's testimony that establishment of the district is not inconsistent with any applicable element of the state comprehensive plan or of the Lee County Comprehensive Plan which is the effective local government comprehensive plan. Additionally, Petitioner's witness Douglas Widmer, Director of Planning and Permitting of Westinghouse Gateway Communities, Inc., was accepted without object as an expert in the area of land use planning, including the many aspects of service delivery to large-scale developments in southwest Florida, with particular emphasis on the matter of determining any inconsistency of service delivery mechanisms and facilities with the state comprehensive plan and the Lee County local government comprehensive plan. In this connection Petitioner's Exhibit N, a detailed analysis of the local Lee County Comprehensive Plan, was introduced into evidence without objection during Mr. Widmer's testimony. He described the elements of the state comprehensive plan and the Lee County plan which apply to the creation of such a district and established that the creation of the district is not inconsistent with either of the pertinent elements of the state plan or of the Lee County plan.

Concerning the state plan, Mr. Widmer established the methodology used by the State of Florida in processing a similar petition to establish a community services district elsewhere in the state and he employed the same methodology. That methodology essentially involves determining the goals, subjects, or policies in the state comprehensive plan which do not relate either to a development nor to establishment of a district and eliminating them, and then eliminating those which apply only to developments. Then the methodology envisions determining, as

to those goals, subjects or policies in the state comprehensive plan which do not apply to establishment of such districts, whether the establishment of it in the present case would not be inconsistent. Using that methodology, Mr. Widmer determined that only subjects 16, 17, 20 and 25 of the state comprehensive plan had some goals or policies, which in one way or the other would apply to the establishment of this district. He established however, that if this district were inaugurated, it would not be inconsistent with any subject, goal or policy in the plan and in fact, was quite consistent with them.

Mr. Widmer further testified describing his extensive review of the local government comprehensive plan involved herein, and established in an uncontroverted manner that establishment of a district would not be inconsistent with any element or portion of the Lee County Comprehensive Plan, in corroboration of Mr. Koste's testimony. (See Petitioner's Exhibit N) Indeed, inasmuch as the above-mentioned development order mandates the establishment of the district, and the Petitioner seeking to initiate the establishment of the district indicates that it will comport with all the conditions of that development order which was promulgated under the aegis of the Lee County Comprehensive Plan, it becomes obvious that the establishment of the subject district will comport with the pertinent provisions of the Lee County Comprehensive Plan.

Mr. Widmer also corroborated Mr. Koste's testimony that the subject land west of I-75 is necessarily a part of the district in order to have a totally functioning community, especially in terms of the drainage and water management function. Mr. Jay Cravens, a Senior Planner for Lee County, also corroborated Mr. Widmer's and Mr. Koste's showing that the creation of the district is not inconsistent with the Lee County Comprehensive Plan.

Mr. Forrest Banks was accepted as an expert engineering witness for Petitioner. He is familiar with the design and construction of various infrastructure facilities for large-scale development, particularly in southwest Florida. He described the water management and control, water supply, sewer, wastewater, road and street light mechanisms required by the Lee County development order for the Gateway Community Development which the district encompasses. He and his professional staff had reviewed alternatives other than having the district provide such services and opined that the district is the optimum type of entity to provide such services. The land area within the proposed district is of sufficient size, compactness and contiguity to be a functional community and organizing that land area under district governance would be the most appropriate alternative for designing,

**199**

financing and installing infrastructure services to that land area to be developed. It is financially and logistically impractical for other local government entities to provide them at present.

In particular, Mr. Banks discussed the engineering aspects of including the land west of I-75 in the district. His testimony was uncontroverted in establishing that the existence of I-75 within the district did not present an engineering impediment to the delivery of services contemplated by the development order for the district to the area west of I-75. He considered various topographical considerations, environmental characteristics involving shape and location of wetlands and arrived at the uncontroverted opinion that the land areas on either side of I-75 were functionally connected, especially concerning drainage and water management, and are amenable to being serviced by the proposed district as a matter of engineering principles. He also showed that taking economies of scale, distances and other factors into consideration, the services which may be provided by the district would be compatible with the capacity and uses of existing services and facilities, local or regional. Indeed it was shown that there were no existing services or facilities on the land with which any district services would be inconsistent. The nearest infrastructure facilities provided by the City of Fort Myers or Lee County other than roads in the immediate area, are indeed some distance removed from the lands of the proposed district.

Gary L. Moyer was accepted as an expert witness in the management of community development districts. He has had substantial experience managing a similar community development district in Florida which, like the proposed one, was established to provide basic infrastructure services to a large-scale community development. He demonstrated that sewer wastewater management and related facilities can be provided by the proposed district both east and west of I-75 on a practical basis. Concerning the power of the district to provide sewer and wastewater management facilities, Mr. Moyer showed that the district can exercise that power in compliance with the Lee County Gateway Development Order to the extent that that order requires the participation of the Gateway Communities, Inc. developer in a study to assess the feasibility of a regional sewage treatment facility. Based upon his experience as a manager of community development districts, Mr. Moyer corroborated the other testimony to the effect that the land area for the proposed Gateway Services District is amenable to separate district governance and he determined there to be no inconsistency in establishing the district vis-a-vis the statutory factors cited below that must be considered by the Governor and cabinet. That opinion is accepted.

200

Dr. James E. Pitts was tendered and accepted as an expert certified public accountant and economist qualified to render opinion testimony on economic assessments related to establishment of the proposed Gateway Services District. Dr. Pitts is the author of the economic impact assessment incorporated as Exhibit 8 to Petitioner's Composite Exhibit H in evidence. He explained in some detail the procedure and methodology employed in arriving at that economic impact assessment, with a view to the requirements of Section 120.54, *Florida Statutes*, and established that two primary functions of the district are economically cognizable. Those are the management function and the financing function. Dr. Pitts showed that the management function has under it the subfunctions of planning, implementation and maintenance.

It is important to understand that the purpose of Dr. Pitts' inquiry was simply and only to assess the economic consequences of establishing the district as a governmental service mechanism to attendant real estate development. He did not assess the economic consequences of the development itself, nor did it involve revisiting the legislative intent and policy behind the enactment of Chapter 190 in its present form to the effect that such independent districts are economic and efficient mechanisms for providing infrastructure services to large-scale community developments such as this one.

Dr. Pitts established that there are four basic groups of "affected persons" involved in any economic assessment of the establishment of such a district. Those persons are the State of Florida and its growth management policies in general; Lee County and its citizens; the present property owners of the land to be serviced by the proposed district; and the future property owners of lands to be serviced by the district who would be in effect consumers of the real estate development performed on lands in the district.

Dr. Pitts reviewed the district petition and established that the estimate of costs to any local or state governmental agencies to implement the proposed district is nominal. He demonstrated that using information at a given point in time concerning cash flows and construction estimates for any possible provisions of infrastructure services by the district in order to determine the financial feasibility of the proposed district, would be subject to change as months and years go by. The use of such information does not go to the essence of estimating the econommic consequences of establishment of the district as a governmental entity to manage and finance basic services, however.

Dr. Pitts established the planning, implementation and maintenance

**201**

subfunctions of the management function category he arrived at, are not yet quantifiable because the district has not been formed and has not made any essential decisions. The county, however, can look at the district as a long-range tool to provide service delivery consistent with the requirements of its development order, in evidence. Moreover, the essential economic benefit of using the district as such a tool is to enhance the intrinsic economic value of the proposed development as well as the assurance to the county that the requirements of its development order will be carried out. Dr. Pitts established that the costs of the management function of the district would represent approximately $12 per acre or $64,000 per year, and that the intrinsic benefits of the management function, although not yet computed, would far outweigh those costs. He then determined that the benefits of the financing function outweighed any of the costs from use of the district, whether the financing function is carried out through bonding or non-bonding sources of funds for installation of the various services and operation of the district.

The establishment of the district would not have an adverse impact on competition or on employment. The State of Florida would not incur any more than nominal costs, but the benefits to the state from establishment of the district would primarily be continuity of management of the various services and carefully planned, implemented and maintained development services which would satisfactorily address the issues raised in the development order. Dr. Pitts established that those benefits are economically cognizable although they are not yet measurable before the district is established and operating.

The costs to Lee County and its citizens would be nominal and indeed the impact of the establishment of the district would be a significant net positive benefit to Lee County and its citizens by enhancing the economic benefits of the proposed development by rendering them more likely to be constructed and "built out" due to the economic efficiency of the district in servicing that development. Moreover, Dr. Pitts showed that the county would not have the burden of providing these specific services and that without the district in place, the development would not have as great a chance or assurance of being able to meet the projected timetable for "build out" which could thereby delay the significant economic benefits flowing to the county through tax revenues, and otherwise, as the result of the development "build-out" time period contemplated. The district is economically speaking as much of a growth management tool for the county and its citizens, as well as for the state, as it is for the current and future landowners and developers within the district. There has

202

been shown to be a net economic benefit from establishment of the district to Lee County.

Concerning the present property owners, and the major developer, Dr. Pitts indicated that there would be a $12 per acre per year cost which would be offset by several economic benefits including: (1) savings from lower construction loan interest rates, resulting in an actual lower cost of the infrastructure to the landowner/developer; (2) long-term financing of the infrastructure at comparatively lower interest rates; (3) an efficient vehicle to facilitate planning, implementing and maintaining improvements; (4) stability of the intrinsic economic values inherent and discussed at length in his testimony; (5) the ability to offer an economically attractive and priced real estate development product to the ultimate consumer.

Concerning future property owners and the ultimate consumers of the real estate development product within the district, Dr. Pitts indicated that the cost would again be substantially around $12 per acre, but that against this cost, which all future property owners would share, the benefits received, would be (in addition to the five enumerated above) that utilities provided by the district would be provided without depreciation and without a profit margin in the rate base which would therefore not be passed on to the consumers; and the ability for consumers to deduct some of the district costs for income tax purposes. In short, Dr. Pitts established that there is no economic basis or reason to prevent establishment of the district and that indeed there is an overall net economic benefit including that on competition and employment in the area, and an overall net economic benefit to all "affected" persons from establishment of the district.

Dr. Lance deHaven-Smith was tendered and accepted as an expert in the area of political science and political economy. His testimony encompassed expert opinion regarding land use regulations, inter-governmental relations, political economy, growth management, and the management and financing of infrastructure for large-scale real estate developments. It was thus established that the district would be limited to the constraints of the Lee County Development Order and that it is an effective management and financing mechanism for service delivery with the specific capability of making decisions with longterm benefits, both for the county, for the developer developing land within the district, and for the ultimate consumers of that developer's product.

Dr. deHaven-Smith established that the proposed district will be the best of three basic alternatives available for providing the infrastructure necessary for the Gateway Community Development Project. Those

**203**

alternatives were: (1) the provision of the infrastructure and services related thereto from Lee County or other public entities; (2) the private alternative of having the developer itself finance, construct, install, maintain and operate the items of infrastructure at issue, or (3) the coinciding or joint-venturing of public and private providers of the infrastructure facilities and services which the proposed district would provide if approved. Dr. deHaven-Smith established that from the view point of sound, longterm planning the establishment of a community development district to finance, install and operate the various infrastructure facilities and services was the most politically and financially feasible alternative for the long run, followed by the alternative of having the county provide the services and facilities. In terms of continuity of maintenance costs, risks of debt and equity financing and the like, the alternative of having the private developer install, operate and maintain the infrastructure services and facilities on a longterm basis is the most risky and least advantageous alternative. From the viewpoint of stability, Dr. deHaven-Smith established that given the likelihood of increasingly limited revenue and cost-cutting political attitudes on the part of the state and the county that the alternative of having the district instead of the county provide the subject services on a self-sustaining basis, is the best one. This is especially true given that the utilities portion of the service would be provided without a profit increment figured upon its utility rate base or net investment which would thus result in a lower cost for these services to the consumers than if they were provided by a governmental entity or by the private developer entity.

In short, Dr. deHaven-Smith concluded that in his professional opinion the best approach for delivering infrastructure and basic services to the Gateway Community Development is the proposed Gateway Services District. In his testimony he established a number of significant benefits from establishment of the district for Gateway Communities Development, Inc., central Lee County, the State of Florida, the Lee County taxpayers, the present property owner and developer and the future property owners and consumers. His expert testimony was uncontroverted and is accepted.

In short, all of the factors required to be considered by Section 190.005(1)(e), *Florida Statutes*, were analyzed by each of the Petitioner's witnesses according to their particular area of expertise, and the consensus of their testimony and other evidence presented by Petitioner is that those requirements will be met. Their testimony was uncontroverted and is accepted.

## CONCLUSIONS

Having considered the totality of the record in this cause and being mindful of the development order of Lee County referenced above and the lack of expressed opposition to the establishment of the subject community services district by Lee County or any other person or entity, it is, concluded:

1. That all statements contained within the petition are found to be true and correct.

2. That the creation of the district is consistent with applicable elements or portions of the Lee County Comprehensive Plan.

3. That the area of land within the proposed district is of sufficient size, sufficiently compact, and is sufficiently contiguous to be developable as one functional, interrelated community.

4. That the district is the best alternative available for delivery community development services and facilities to the area that will be served by the district.

5. That the community development services and facilities of the district would be compatible with the capacity and uses of existing local and regional community development services and facilities.

6. That the area that will be served by the district is amenable to separate, special-district government.